No. 2398.

LOUIS WILLIAMS v. THE STATE.

1. PRACTICE—EVIDENCE—IMPEACHMENT OF A WITNESS.—Under our practice, a witness called by the opposing party may be discredited by proving that on a former occasion he made a statement inconsistent with his testimony on the trial, provided such statement be material to the issue. The witness may also be discredited by proof that, on a former trial, he omitted to state facts stated by him on the pending trial. And generally, whenever, on a former occasion, it was the duty of the witness to state the whole truth, it is admissible to show that in his statement he omitted facts sworn to by him at the trial. But it is only upon a denial, direct or qualified, by the witness, that such statements were made, that proof of them can be made. The impugned witness in this case not only did not deny the inconsistent statements imputed to her, but admitted that she made them. *Held,* that under the rule announced, the impeaching testimony was erroneously admitted.

2. SAME.—It is now a well settled rule of practice in this State that an impeached witness may be corroborated by proof that he had at other times made the same statements as those testified to by him on the trial, and about which he was impeached. Under this rule, it is *held* that the trial court erred in refusing to permit the defendant to introduce proof to support his impeached witness by showing that, prior to the trial, she made statements substantially the same as those she made on the trial and about which she was impeached.

3. MURDER—MANSLAUGHTER—CHARGE OF THE COURT—WHEN THE ADEQUATE CAUSE relied upon to reduce murder to manslaughter is insulting language by the person slain towards the female relative of the slayer, it is error for the trial court to give in charge to the jury the provisions of article 594 of the Penal Code, to the effect that the provocation must arise at the time of the killing, and that the passion must not be the

result of a previous provocation. On the contrary, the jury in such cases should be instructed that the 'time intervening between the slayer's apprisal of the insult and his first meeting with deceased is not a material consideration, provided the adequate cause be shown, and the state of the slayer's mind, predicated thereon, did actually exist at the time of the killing.

4. Same—Verdict.—It is not essential, though proper, that the charge of the court should instruct the jury in the forms of verdicts which may be rendered by them; but, when such an instruction is given, it should embrace every verdict which might be rendered in the case.

Appeal from the District Court of Bexar. Tried below before the Hon. G. H. Noonan.

The conviction in this case was in the second degree for the murder of James Brown, in Bexar county, on the seventh day of May, 1886. The penalty assessed against the appellant was a term of seven years in the penitentiary.

David Coulson was the first witness for the State. He testified that he lived within the city limits of San Antonio, about two and a half miles west from the court house. He knew the defendant, and was acquainted with Brown at the time of his death. Brown was then in the employ of the witness, and had been for about three months. The witness had a dairy on his place, which he had leased to a Mr. Hand. Prior to the leasing of the dairy to Mr. Hand, the defendant had been in the witness's employ. Subsequent to that time, and at the time of the homicide, defendant was in Hand's employ, driving the dairy wagon. He and his wife occupied a house on the witness's place, about one hundred and forty yards from witness's residence. The deceased lodged at the witness's house, but boarded at defendant's house.

In connection with his dairy business, Mr. Hand ran a creamery, which was situated in a building on Houston street, in San Antonio, about two and three-quarter miles distant from the dairy. The witness went to Hand's creamery a little after four o'clock on the evening of May 7, 1886. He either found the defendant at the creamery, or the defendant came there soon after witness's arrival. He was in a towering rage, no one but defendant and witness being then in the creamery room, though several parties were in the building. No third party that witness could recollect took part in the conversation which ensued between witness and defendant. Speaking to witness about the deceased,

and cursing violently, the defendant told witness that he would be "God d—d if he didn't kill Jimmy," the deceased. Witness, in reply to this declaration, remonstrated with defendant, and attempted to dissuade him from his declared purpose, but defendant persisted in declaring that he would kill the deceased. In connection with each of the threats so made, the defendant said that deceased had cursed his wife, and that he would not submit to that from any man. He assigned no other reason for his deadly purpose than that deceased had cursed his wife. Witness presently left the creamery. Defendant remained, and the last words witness heard him utter were repetitions of his threat to kill the deceased. He was exceedingly angry. Witness got home about dusk, when the deceased met him and took his horse. Witness did not then see the defendant, who rarely got back to the dairy until nearly nine o'clock at night. Witness did not see the deceased again until between ten and fifteen minutes before eight o'clock. He had then been shot. When deceased took witness's horse, witness went into his house, threw off his coat, took off his shoes, and got some paper on which to write a pay check for the deceased. Some time later and about eight o'clock, witness heard a shot. He knew at once from the sound that the shot was fired at or about the defendant's house, and at once put on his shoes to go there. About the time he got his shoes on, a second shot was fired, and almost immediately a man came to his house to notify him of trouble at defendant's house. Witness went at once to defendant's place, and at the barn met the defendant, with a pistol in his hand, hunting for deceased, and Mrs. Williams following behind him, begging him to stop. When witness met defendant, he said to witness: "I shot at him, d—n him, and I think I hit him; if I didn't I will kill him before day." At this time Mrs. Williams was begging defendant to desist and give up his pistol. She also asked witness to take the pistol. Mrs. Williams finally induced defendant to go into the house and sit down. After much persuasion and the assurance of the witness that Brown's pistol was still at witness's house, defendant gave his pistol to the witness. While protesting against returning to the house, and surrendering his pistol, the defendant declared that he did not want to give the deceased an advantage over him, and that if he went into the house the deceased would kill him.

In the same connection he declared that he had shot the deceased because he cursed his wife. He assigned no other cause

for the shooting. He declared again, as he had previously declared to witness, that deceased cursed his wife that morning, but he did not say at what time in the morning. The witness made an examination of defendant's premises after the shooting. He found no blood in the house, but found the stain of burned powder on a towel which hung on the right hand facing of the door of the room which was used as a sitting and dining room. The shooting which, as stated, took place at about eight o'clock, occurred while the people in defendant's house were at supper. The table was still set when witness went in after the shooting. Several persons boarded with defendant, and were at the house when witness got there. Pretorius, Allen Sharpley and Jack Mitchell were there, and witness believed that H. P. Howell, William Swaggerty and Frank Nolen were there. J. T. Dyall was not then boarding with defendant, but with his brother-in-law, who lived in a house about thirty feet distant from defendant's house. Other men whose names were mentioned by counsel (not disclosed in the record) were there. Witness was of impression that Mr. Dyall, who was in the last stages of consumption, went back to his home in Alabama to die. Another man, known as Ed., went from San Antonio to Fort Worth. If he was now in San Antonio witness did not know it. He did not know what had become of Howell. One or two of the boys who were at defendant's house when the shooting occurred, according to witness's information, joined the army and afterwards deserted. Witness did not know what became of Allen Sharpley. He knew Swaggerty's whereabouts for a time, but did not know where he now lived. Another man referred to the witness knew only as the man he saw with Major Teel after either the preliminary trial of this defendant before the justice of the peace or his habeas corpus trial before Judge Noonan. That man went from the court house with Major Teel, but witness did dot know, except from hearsay, where he went to. Witness did not know what had become of either Mitchell or Nolen. The several parties named were employes of Hand. They disappeared very soon after the homicide. Witness had great difficulty in getting any of them to stay on the place, even for a short time, after the shooting.

The witness did not know that defendant's shot had taken effect upon Brown's body when he got defendant's pistol. When he secured the pistol he took it to his own house and immediately returned to defendant's house. Meanwhile defendant dis-

appeared. Witness was gone with the pistol but very few minutes. While disposing of defendant's pistol, at his house, witness made search for deceased's pistol, and found it among deceased's clothes in his room. It had not been discharged. The second shot fired by defendant was fired at a boy called "Skinhead." At least "Skinhead" said that the shot was fired at him, and defendant, who was present and heard what "Skinhead" said, remarked that he fired at him ("Skinhead") mistaking him for the deceased. When this second shot was fired, the defendant was standing south of his house, and between the house and the barn, and the boy called "Skinhead" who, witness thought, was Sharpley, was in the brush, jumping pretty high. Referring to this incident after the shooting, defendant said that he thought "Skinhead" was the deceased, and that he was going to witness's house to get his pistol. During this parley, which was immediately after the shooting, and before Mrs. Williams and witness got defendant into the house, defendant said that he knew deceased had gone to get his pistol, and refused to surrender his pistol. The interval between the two shots did not exceed a minute. Mrs. Williams, in the presence of defendant, said that defendant fired the first shot from the inside of his house. Other parties told witness the same thing, but witness could not say that defendant was then present. Defendant justified himself in shooting by saying to his wife, in witness's hearing: "I shot because he cursed you, Mamie." He assigned no other reason. Witness could not say that anybody, in defendant's presence, said what deceased was doing at the time of or immediately before the shooting, but defendant told witness, in substance, that when he fired the first shot the deceased was "getting out of the way in the door." He did not say what the deceased was doing when he, defendant, reached home. Defendant did not tell witness where he stood when he fired the first shot.

After he put defendant's pistol away, and searched for and found that of the deceased, the witness instituted a search for Brown, and found him in the mesquite brush, about one hundred and eighty yards due west of his (witness's) house. He was suffering grievously from a pistol wound. The ball entered the right side just above the collar bone, but witness could not say how it ranged. Deceased said nothing about his condition, nor was his condition discussed by any one in witness's presence. Brown was found about twenty minutes after the shooting. He

was taken to a house on a litter, and died there about an hour and a half later. If the defendant came back to the dairy, or was on witness's place after witness left him to go to his own home, with his pistol, witness did not know it. He did not see defendant again until he was brought back by the officers. The witness could not remember that anything of a particular nature was said by defendant, after the shooting, as to whether he was going to remain on witness's place over night, or whether he was going to town to surrender. Witness understood him, however, to promise to spend the remainder of the night up stairs in witness's house, and did not expect him to leave when he, witness, went to the house with the pistol. It was not then known that Brown had been hit. The pistol used by defendant was a revolver, and witness believed it to be the one now exhibited to him by counsel. It was now in the condition that witness received it from the hands of defendant. Four barrels were loaded and two empty. The empty barrels did not join. Witness did not remember that he ever heard defendant say who owned the pistol, but he did hear Ed Lewis say who owned it. Witness did not know the present whereabouts of Lewis. The last he ever heard of Lewis was through a letter written by him from Fort Worth to witness's wife. Lewis, at the time of the homicide, was in the employ of Mr. Hand, and had charge of the creamery engine. He remained on the place but a short time after the homicide.

When defendant gave his pistol to witness, he did not tell witness who to give it to. Several parties on that night told witness where defendant got the pistol, but witness could not remember that defendant was present. He did not think defendant kept a pistol on his place: at all events, witness had never heard of his doing so during the year he had him in his employ. Witness did not think that defendant, at the time he left, knew positively that he had shot the deceased. He told witness that he thought he had hit deceased, but did not claim to be certain that he had. Deceased at that time had not been found. The defendant was brought back to San Antonio by Deputy Sheriff Alexander and somebody else, two or three days after the shooting. A gentleman and lady brought a message to witness's house on the night of, but after, the shooting. Witness knew Puckeridge and his wife. They were at witness's house about three-quarters of an hour before the death of deceased, but witness was now unable to say whether or not they, or either of

them, delivered a message to the deceased. Puckeridge lived about half a mile northeast of witness, but not in the direction of town. There was no road from witness's house to that of Puckeridge.

On his cross examination, the witness stated that, at the time of the homicide, the defendant was in the employ of Mr. Hand, and not of him, witness. Hand had leased witness's dairy, bought milk of witness, and was running the business, but witness did not consider himself and Hand to be in partnership. Hand carried on the creamery on Houston street, and for milk paid witness a certain amount. Witness's business at the creamery on the day of the homicide, where, as stated, he met the defendant, was to get the money then due him from Mr. Hand. Witness owned the engine and other articles used in the creamery. He had an interest in the creamery, but not as partner. It was about four o'clock on the evening of the fatal day that witness saw defendant at the creamery. He did not know where, if anywhere, he saw defendant in the morning of that day. Defendant's usual hour of starting from the dairy to town in the morning was at four or a little past four o'clock. Witness may have seen defendant on the morning of the fatal day, but did not recollect doing so.

Question. "You say about four o'clock in the evening was the first time you saw him on the seventh?"

Answer. "I didn't say that exactly. It was the first time I remember to have seen him. He was then mad, and cursing bitterly."

Q. "He told you that Brown had cursed his wife?"

A. "No, he didn't; he said 'Jimmy,' Jimmy is Brown, and he used the term 'Jimmy.' He was a favorite among us all, and his name was 'Jimmy.' I called all my hands by their first names. I had employed Mr. Williams when in Ohio, and he came on here and we had lived in perfect friendship. Before he cursed so in my presence, my feelings were entirely friendly. His swearing in my presence did not command my approval at all. I was not pleased with his manner; I thought it was insulting, he knowing my position. I have not employed nor given my support to any one to prosecute this defendant. I have not paid a nickel to do so, nor promised to pay any, that I know of. I don't recollect anything of that sort."

Q. "Have you not talked to a very great many people in relation to this matter?"

A. "Yes [and you would have talked too] if you had been placed in my position, and been published in the papers by reporters as a party to the thing. I published a card in the Express newspaper."

Q. "Did you state in it that that conversation took place at four o'clock in the morning?"

A. "The Express, as it frequently does, made a terrible blunder."

Q. "You wrote a communication to the Express over your own signature?"

A. "I did not write a communication to the Express; another gentleman, Judge Price, wrote that document."

Q. "Did you ever, at any time, correct that matter about four o'clock in the morning?"

A. "I don't recollect. Of course, if I saw it, I applied for a correction of it."

Q. "Didn't Mr. Price read you that communication before you signed it for publication?"

A. "Not as at four o'clock in the morning. Of course it was written in my presence. My recollection is that I signed the document myself, but I can't say so positively. I spoke of it frequently. I have been asked five hundred times: 'Where is the man who killed the man at your place?'"

Q. "Have you not stated that he ought to be hung, and that his neck ought to be broken?"

A. "I am glad you asked that question, and I will answer it. I said that it was a cowardly act. I have said that of him (defendant) as of any other man under similar circumstances. I believe in the enforcement of the law for crime. I don't know that I am antagonistic to this defendant outside of this one offense. This offense is the one I am soured about. The newspapers put it on my place anyhow, and I did not, as I could not, deny that it was on my place."

Q. "Did you not state that you had leased your cows to Mr. Hand?"

A. "I changed relations that day. I suppose Mr. Williams knew it. I don't remember seeing him (defendant) on the seventh, until four o'clock in the evening, when I had a conversation with him at the creamery. I don't know that I then told him of the change in my relations with Mr. Hand. Jimmy was in my employ. The cows and the interest in the pasture were

mine, and I took charge next morning, as per agreement. None of my cows were shot."

Q. "Were none of them hurt in any way?"

A. "I think not, sir, by that shooting. From the time I heard the first shot and went out and met Mr. Williams, I had time to put on my shoes and walk about óne hundred yards. It was only a minute or two. I went out in a hurry and met Mr. Williams."

Continuing in reply to questions, the witness said that, upon going from his house after hearing the shots, he met the defendant at a point about twenty feet distant from his west gate. He could not say exactly how long he stood there with defendant and his wife before defendant was prevailed upon by the pleadings of his wife to go back to his house. Some time elapsed after reaching the house before the defendant could be induced to surrender his pistol to the witness. Not instantly, but soon after witness got the pistol, he went direct to his own house to put it away. He returned to defendant's house almost immediately, and found Mrs. Williams, her children and the men, except defendant, "scattered about." The "boys" (meaning the hands) were about the place when witness and Mrs. Williams were trying to get defendant to return to his house from the point near witness's west gate, but none of them came to where witness, Mrs. Williams and defendant then were. They were "scattered about" with lanterns, talking and laughing about "Skinhead." Witness did not know that a single person of those scattered about came back to the house until he, having taken defendant's pistol to his own house, returned to defendant's house. Witness's card in the Express of May 12, 1886, did not purport to be a circumstantial narration of what occurred at the time of the homicide, but was an answer to misrepresentations about himself, made by the reporter of that paper, who, in the previous notice of the tragedy, actually charged witness with complicity in the murder; at least, the witness so construed the language of the article, and knew that he was blamed by the officers, Captain Shardein, particularly, for not giving information on that night of what had occurred. As a matter of fact, the witness was on the eve of starting to town to lodge information when one of the other men, much younger than witness, proposed to go, and witness directed him to go at once, and to report the matter at police headquarters, after summoning a doctor. Witness had been told that that man did not appear at

headquarters. Witness did not arrest defendant when told that he had shot a man, nor did he attempt to do so. He had never arrested a man in his life, and never expected nor intended to arrest one in the future. He did not call upon Hand's employes to arrest defendant, because defendant promised, and he expected him, to stay locked up, up stairs in his house until morning.

Q. "How long a time elapsed from the time you started to hunt for Brown until you found him."

A. "I don't know, nor can I approximate the time, but it was not long. I went into the house to see if any one had been shot, and could find no hole. I then said: 'He is hit, and now, boys, we must find him.' Williams was gone, and it was not a long time until Brown was found. I don't recollect who was first to find him, but we were all there pretty soon. I did not look for a track of blood. The jury of inquest were there, and I left it to them. I came in before day to see what was to be done. I went to the house of the justice of the peace on Commerce street and woke him up. This was early—before daylight. I went to police headquarters first, and was there instructed to go first to the justice of the peace, who would be in his office at seven o'clock. I went then to the residence of Justice Crawford and woke him up. I went into his bed room. Crawford was sick, and told me that Justice Adam would be at his office at seven o'clock. I was at Adam's office at seven o'clock, but did not find him. I was in there at intervals until he came. Brown was badly wounded when we found him. He was talking some. We carried him to Houston's house, about two hundred yards from where we found him. He lived about three-quarters of an hour after reaching the house. Brown had been working for me up to that time, but then had his notice. I was not present a great deal at Houston's before his death, but hurried off to get a doctor. I sent a man for the doctor as soon as I could get a horse from the pasture. Brown made no statement about the shooting, so far as I know. He (Brown) was a quiet, inoffensive man; a man who had never, so far as witness knew, wronged any one. His superior had never been in witness's employ. Defendant, when not in liquor, was a quiet man. He did not drink much. I don't know that he ever had trouble with the people on my place. I know of no other serious difficulty he ever had. He had had trouble with one Mott, but I don't know what about. That falling out lasted for a few days. I have disagreed with men who worked for me.

The defendant worked for me a good while, but possibly not so long as three or four years. I found a pistol among Brown's effects. I heard it said that he had a pistol, and as I found one among his effects I inferred that it belonged to him. I don't recollect whether it was loaded or unloaded, but my impression is that it was loaded. I did not see Brown have a pistol that day. I never saw a man have a pistol on my place until I saw the pistol in the hands of Williams. I did not permit the bringing of pistols on my place, as I was afraid of them. I had heard Williams and others say that he had a pistol, but Williams was not in my employ. I knew that the officers brought Williams back, because they told me so. Mr. Swaggerty was at that time on the place. He was one of the boys, and occupied the room occupied by the other of Hand's employes. Defendant was not there when I got back after taking his pistol to my house. They told me he had gone, and, as we could not find him, I supposed that he had gone. I have no mark on the pistol you show me by which to know that it is the pistol I got from defendant. It looks like the same pistol, and I think it is the same. The chambers are in the same condition as when I delivered it to 'Squire Adams—an empty chamber, then a loaded, and then an empty one. I am satisfied the pistol is the same."

Q. "You say a man named Ed told you it belonged to him? Was that man present when he said it belonged to you?"

A. "I don't remember what he did say. He told me so. I don't think the defendant was present. I don't know of my own knowledge who is the owner of the pistol. I did not sell it."

Q. "You say that he said to his wife, in your presence: 'I shot him because he cursed you, Mamie?' Now, what was the statement made in regard to the shooting when he talked to his wife and called her by name?"

A. "I think he said: 'I would kill any man who would curse you.'"

Q. "You don't know exactly what it was?"

A. "I exactly know that he said he would kill any man for cursing her; that that was the reason he did it. He said before that he was going to kill deceased for that reason—for cursing his wife."

Q. "Do you know John Tom McGee, and have you ever had a conversation with him about this matter?"

A. "I know John Tom McGee, and have known him a long

while, and I suppose that I have had a conversation with him about this matter. He has been at my house frequently."

Q. "Did you not, at your place, a few days after the homicide, tell John Tom McGee that defendant told you that, if you would discharge Brown it would end the difficulty?"

A. "I did not, sir."

Q. "Did you not, in the same connection, say to him that the Virgin Mary had been insulted, and that the defendant's wife was no better?"

A. "I did not. I did not tell him that the Virgin Mary had ever been insulted. I told him that Queen Victoria, a very different person than the Virgin Mary, had been insulted a thousand times, and is a noble old matron yet."

Q. "A short time after Brown took your horse, did you not ask some of the boys for Brown? Did they not tell you that he had gone to defendant's house, and did you not exclaim: 'What! That fellow go over there after insulting that man's wife?'"

A. "I did not. I will tell you what I said. I told Mr. Williams that I would discharge Brown, and had deposited the money to pay him off. When he took my horse I went into the house, laid off my clothes, and came out about the time that Brown should have put the horse up. I called twice for Brown, when somebody said that he had gone to defendant's to get supper, and I said: 'What! Is it possible he has gone to that man's house after cursing his wife?' I turned over to the undertaker Brown's effects, including his pistol and the money I was due him, to pay for Brown's burial. I said that I supposed Dyall was dead. He left here for Alabama in the last stages of consumption, and I have never heard from him since. He was here at the defendant's examining trial. I do not know the present whereabouts of Herman, Fuch, Shapley, Lewis, Swaggerty, Mitchell nor Nolan."

Re-examined, the witness said: "I told the defendant I was going to discharge Brown. I told him I had the money all ready. I told him, when he was cursing, that it was not necessary to curse, as I would discharge Brown and he would not see him again. That was about four o'clock. I don't know of my own knowledge that Brown cursed Mrs. Williams. I got that information only from Williams, and told him that I would not tolerate on my place a man who would curse a woman, and that I would discharge Brown as soon as I got home. I had not been home exceeding thirty or forty minutes when Williams got back

from town. He did not, on his return, call upon me to know if I had, or intended to, carry out my avowed purpose to discharge Brown. I don't know how long Williams had been home before he shot Brown, but the shooting occurred a half or three-quarters of an hour earlier than his usual time of getting home. I did not bring the defendant here from Ohio. I hired him there and he came here. He proved a first rate hand. I have no personal feeling against him, outside of this murder. After I took the pistol in the house and came back and found Williams gone, I called the boys together and made them show how the thing was. They showed me a powder burn on a barrel by the door facing, which showed the direction of the shot. I said: 'If he is shot there will be no bullet found.' Finding none, I said: 'There is no bullet hole to be found, boys. He is shot. Now, let's find him.' Williams did not know whether he had hit him or not. He told me he thought he hit him.' As soon as we found him I ordered a litter, and a horse was given a man to go to town. I was going at first, but this man said he was younger and could go better. I told him to go to police headquarters, and from there telephone for a doctor. It was **no** fault of mine that the man did not go to police headquarters. He returned after Brown's death. No doctor came back with him, he said, because he had not taken a horse for him. If I am a judge, I would say that defendant was drinking heavily at the time of the homicide. He did not repeat to me the words Brown used to his wife. He merely said that Brown cursed her. · I never had a conversation with John Tom McGee in which I said anything about the Virgin Mary. If I said anything to him at all, I may have said what I said to Williams, that Queen Victoria had been cursed a thousand times, and would be cursed as long as there was a man on the Emerald Isle, but she was a noble old lady still. I told Williams that I had been cursed, and it might be some man had cursed my wife, but I had not killed that man. I said to him: 'The day you do it your wife and children will be orphans, and you will be spending your days in the penitentiary. Don't kick at trifles any more; I will discharge him and you will not see any more of him; he is a poor, ignorant creature anyway.' I told John Tom McGee this whole conversation. I also told Williams that it was folly and madness to think about killing Brown, and that I would discharge Brown as soon as I got home, as I would not have a man on my place who would curse a woman. I would probably have discharged Brown very soon any way,

as I had no further use for him. I never knew anything about a cow of mine being hurt. A man had better strike me than one of my cows."

Mrs. Annie Puckeridge was the next witness for the State She testified that she lived with her husband, P. M. Puckeridge, on the second Alazan creek, about a mile and a half distant from Coulson's place, and not quite so far from the business center of San Antonio. Witness had seen defendant previous to the night of May 7, 1886, but had no particular acquaintance with him. The defendant came to witness's house between eight and nine o'clock on the night of May 7, 1886, just as witness and her husband were preparing to go to bed. He stopped at the fence and called for witness's husband. Upon the invitation of Mr. Puckeridge, the defendant came into the house. As soon as he got in, the defendant said: "I fired at a man, and I am afraid I shot my wife." Witness then said that she had better go and see, and asked her husband to go with her. Within a few minutes witness and her husband started, the witness taking a note written by defendant, which she gave Mrs. Williams when she arrived at the dairy. She did not read the note, and did not know its contents. Defendant remained at witness's house, as did her little girl, who was in bed. Witness and her husband remained at the dairy about half an hour. When they returned home witness gave defendant some money which Mrs. Williams sent by her. Witness did not know how much money Mrs. Williams sent defendant by her. It was in small gold pieces, and one fifty cent silver piece. Mrs. Williams went to Coulson before she gave the witness the money, and Coulson told her to send word to her husband to fly. At least Mrs. Williams brought that message from Coulson to witness, to be delivered to the defendant. Mrs. Williams said to witness, when she gave her the money: "Mr. Coulson says tell Louis to fly." Witness did not see Coulson give Mrs. Williams the money, but she knew that Mrs. Williams had no money when she reached her, and that she went at once to Mr. Coulson. She was at Coulson's house about ten minutes before she got back with the money. When witness got back she found defendant lying down on a small feather bed She gave him the money, told him the man was shot, and that he had better leave, but she did not tell him that Coulson advised him to fly. Defendant then told witness that he fired his first shot because he thought Brown had a revolver. Witness knew that Brown was dead, but did not tell defendant so. When wit-

ness told defendant that the man was shot, he simply exclaimed: "My God!" and, advised by witness and her husband, he left immediately, and witness saw no more of him. He did not say why he shot the man, or, if he did, witness did not hear him. It was after ten o'clock when defendant left witness's house. Witness did not take a note from Mrs. Williams to defendant.

James Van Riper testified, for the State, that he was a deputy sheriff of Bexar county. He and Deputy Sheriff Bob Alexander left San Antonio on the evening of May 9, 1886, to arrest the defendant for the murder of Brown. Witness could not now remember whether or not he had papers for the arrest of defendant. They found defendant in the hills of Blanco county, about twelve miles from Blanco city, about midday on May 10, and arrested him. He was alone and on foot. Witness did not ascertain whether or not defendant went into the city of San Antonio after shooting Brown.

The State rested.

Mrs. Mary A. Williams, the wife of the defendant, was his first witness. She testified that, for eighteen months which had elapsed since the killing of Brown by the defendant, she had earned for herself and three small children a precarious support by plain sewing. The events of the day preceding and the night of the shooting were indelibly stamped upon her memory. She had been up all the night of May 6, with her sick child, and was sitting with it in her lap at half past three o'clock on the next morning, when the deceased came to the house. She was still in her wraps. Deceased stepped into the room, and said to witness: "You are up mighty early." Witness replied: "It may be early for you, but I begin to feel that it is quite late." She then looked at defendant, and discovered an expression on his face such as she had never seen on a man's face before. Deceased then said: "Well, I begin to feel very sleepy too. You come to bed with me for a little while and we will both feel better." Witness said to him: "How dare you talk so to me. You leave this house this instant!" After a moment's hesitation the deceased turned and left the room, and witness thought he had gone. A few minutes later deceased returned to the house, stopped at the room occupied by the boys, and commenced cursing and swearing so violently that he aroused the children in witness's room. Witness called to him not to stop at that room swearing, but to go to the south room where the other men were sleeping. Deceased, in reply, said to witness: "By G–d you don't like it!"

Witness replied: "No, Jimmy, I don't like it. It is not right for you to come into my house and talk as you have in the absence of my husband." Deceased then said: "By G–d, if you don't like it you need not take it." He then went swearing and cursing to the men's room, said something about sleeping until ten o'clock, went noisily to bed, and said he would not get up for any d—d son of a bitch. Witness got up and had breakfast ready at about daylight. Two of the boarders came down and sat down to breakfast, when witness started to the well to get a bucket of water. As she stepped outside from the house, Brown confronted her and said: "You did not like what I said this morning? Well, if you don't like it you can tell Louis about it, and I will shoot him. You know I have got something to shoot with." Witness at first intended not to tell her husband anything about Brown's conduct, but, reflecting that he would hear of it through the other men, she changed her mind. She first told him about Brown swearing at her. She advised him to go to town and tell Mr. Coulson to send Brown away, as she did not want a man on the place who had insulted her. Defendant then asked: "Did he insult you, Mamie?" Witness replied: "Yes," and, placing her hand on her husband's shoulder, told him exactly what Brown said to her. She then asked her husband to say nothing about it, as she feared defendant would execute his threat to shoot him. Defendant put on his coat at once, jumped into his wagon and went to town.

Recurring to the action of the deceased at her house in the early morning, the witness stated that the deceased said nothing immediately after she refused to go to bed with him. but on his return a few moments later he uttered horrible oaths, and used language too foul for a woman to repeat. He said, among other things, that if any "d—d son of a bitch didn't like what he said they could just kiss his ——." Witness understood him to apply that remark to her, as he was talking to her about what he had previously said to her. Witness told her husband of that conversation when he came home to dinner. The little room into which deceased went after insulting and cursing witness was occupied at that moment by a man named Pretorius and a man named John Fuchs. The boys, Sharpley, Swaggerty, Harmon and "Johnny," and the man Mitchell, were boarding at defendant's house at the time. Deceased took his meals there, but slept at Coulson's. Witness's husband had been gone to town about thirty minutes when deceased pushed open witness's room

door and came in.  It was then between three and four o'clock, and long before the usual breakfast hour, which was half-past seven o'clock.  Witness did not know whether any of her boarders were up and out at the cow pens when deceased invaded her private room.  Witness's house consisted of three rooms, one of them being a sort of kitchen.  Witness's room opened into the kitchen.  The boys slept in the room nearest the dairy.  They habitually got up before defendant did, and milked the cows at the dairy, which was about two hundred yards distant from the house.  Defendant got back home from his morning round about nine o'clock.  He went to sleep at once, and when he got up to dinner at two or half-past two o'clock, the witness told him of the conduct of the deceased.  Mr. Dyall, one of the boarders, went to town with the defendant when defendant went on his evening round.  Defendant returned from his evening trip at about candle light, or about seven o'clock.  He did not own any arms at that time, and if there were any pistols on the place before that night, witness did not know it.  The men had just sat down at the supper table, and witness had just retired to her room to get her baby to bed, when the shooting occurred. Howell, Pretorius, Fuchs, Allen, Sharpley and Mitchell were then at the supper table.  Neither Lewis nor Swaggerty were there, and witness did not think that Frank Nolan was.  From the kitchen, where the witness was, she heard defendant slip into the door, and say:  "Jimmy, is it true that you insulted my wife?"  She as distinctly heard deceased reply:  "Yes, it is." Defendant said something which witness did not hear.  She got up at once to lay the baby down, when Brown sprang into the kitchen, at which instant the first shot was fired.  Brown then ran out of the house.  The men then ran out of the house, followed by defendant with his pistol in his hand.  Defendant said, as he ran out of the house, that he did not think he had killed Brown.  He met Mr. Coulson a short distance from the house and told him that he was after Brown, but did not think that he had shot him.  Mr. Coulson asked defendant for his pistol.  Defendant refused to surrender it because he said Brown was armed, and if he gave up his pistol he would have no means of defense.  Witness and Coulson then induced defendant to return to the house.  After some persuasion, defendant gave his pistol to Coulson.  Coulson started home with the pistol, and defendant left to go to town.  Witness advised him not to go to town. She reminded him that he was a poor man, without money, and

that if he went to town he would be arrested, jailed and convicted summarily.    He said that he thought it best to go to town.    He then went on as far as Puckeridge's, and sent Mr. and Mrs. Puckeridge back to witness.

Mr. and Mrs. Puckeridge, one of them bearing a note to witness from defendant, reached witness's house about half past eight o'clock.    That note was now lost or had been destroyed. Witness told Mr. Puckeridge that she wanted to send some money to her husband.    Accordingly, she got together what money she had, and went to Mr. Coulson for more.    Coulson at first said that he had no money, but, after hunting about, he gave witness sixty-five cents, and said:   "Here, give this to Louis, and tell him to get out of the way.    God knows if I had any more I would give it to him."    Mr. Coulson's direction to witness was to tell Louis to fly the country.    Witness gave that money to Mrs. Puckeridge, and told her to give it to defendant, and to tell defendant that Mr. Coulson said for him to fly the country.    Witness told the defendant, just before he left home, that, as he was a poor man, it would not do for him to stay, and that he had better leave.    Altogether, witness and her husband had lived on Coulson's ranch about three years.    They lived there once as long as twelve consecutive months.    Witness knew of a difficulty between defendant and Coulson which occurred a short time before the homicide.    The difficulty arose over the striking of one of Coulson's cows by defendant.    At first the witness told no one save her husband about the insult offered her by deceased. She was too much mortified to tell any one else until the next day, when Mr. Hand, in conversation with her, asked her about the affair, and she told him, or started to tell him.

Cross examined, the witness said that she forgot to state in her testimony in chief that defendant fired a second shot after he ran out of the house in pursuit of Brown.    He followed Brown out of the same door, and at a point about fifty yards from the house, fired the second shot at a man whom he was pursuing, evidently under the impression that he was Brown.    In fact, that man was a young fellow called "Skinhead."    Brown was then running northwest from Coulson's house.    Witness was with her husband, endeavoring to prevent him from shooting, when he fired the second shot.    After he had fired that second shot, defendant remarked that he did not think he had hit Brown. Coulson then came up and tried to get defendant's pistol.    If defendant then told Coulson that he thought he had hit Brown, and

that if he had not, he intended to kill him before morning, witness did not hear it. Defendant said to Coulson, in explanation of the shooting: "He insulted my wife, and no man, not even my brother, can do that." The witness followed her husband out of the house because she did not want him to kill Brown. and wanted to prevent him from shooting. Witness did nothing while outside of the house. Coulson asked defendant for his pistol, which defendant refused to surrender because, he said, Brown was armed. Brown might have been armed. He was in his shirt sleeves at supper, but witness did not know that he was not armed. Witness then knew that Brown had been hit, because she heard him say so as he fled through the door after the first shot. He had not been found when witness and Coulson got defendant in the house. Witness and Coulson prevailed upon defendant to surrender his pistol to Coulson within five minutes after they got him into the house. Witness did not tell defendant that she knew Brown was hit. She was too intensely excited to think of doing so. Defendant fired his first shot from the kitchen door, at a distance of about ten feet from Brown, who was then in the kitchen. Brown was sitting at the supper table when defendant came in. Brown did not speak loud when, as he went out of the door, he threw his hand to his shoulder and said: "I am shot." Witness was standing near the door, and heard him distinctly, but could not say that defendant heard him. Brown was standing in witness's room when the first shot was fired. He went out of the house through the front door, and went west around the house. Witness and her husband went out at the same door, but around the house in the opposite direction. Witness went out with her husband, and, as she did not know which direction Brown took on getting out of the house, she supposed the defendant did not know. Witness did not try to get defendant to surrender his pistol until after the second shot was fired. When Coulson came up he asked defendant what he was doing. Defendant replied that he was trying to shoot Brown for insulting his wife. Defendant got the pistol somewhere in town, but witness did not know where. It was a fact that defendant sold a pistol about two months before the homicide, and borrowed it that afternoon. Defendant did not tell witness that he had done so.

Q. "Did you not swear once that your husband owned the pistol and told you that he had sold it to E. C. Lewis about a month before, and borrowed it from him that evening?"

A. "Yes, sir, I did."

Q. "Is it not a fact that your husband told you he had sold the pistol to Ed Lewis about a month before and got it from him that afternoon?"

A. "Yes, sir. My husband must have been on the premises twenty-five or thirty minutes before he left. He did not know, when he left, that Brown had been fatally shot."

Q. "You did not tell him, up to the time that he left, that Brown was shot?"

A. "I did; but he did not know that Brown was fatally shot. I said to him: 'I think you hit Jimmy, and you had better go away, because, if you should meet him, there would be a difficulty and you might get killed.' Coulson then had his pistol, and he had nothing to defend with. I wanted to get him out of the trouble. I did say that I told Captain Hughes about this transaction on the next morning. I said that I told Mr. Hand. I know Captain Hughes and R. B. Alexander. They came to my house on the evening after the homicide, and I made a statement to them, which was true as far as it went."

Q. "Did you claim to them at that time that deceased went to your room and made an indecent proposal to you—a proposal to go to bed with him."

A. "I did not."

Q. "Did you testify in this case before the coroner's inquest?"

A. "That is my signature. I said all that is set forth in that document, on the seventh day of May, 1886."

At this point the State read in evidence the written testimony of Mrs. Williams, taken at the inquest. It reads as follows: "I am the wife of Louis V. Williams. Jim Brown came over next to my room and began to swear. I told him: 'Jim, please don't swear that way,' and he says, 'I don't give a God d—n. If you don't like it you need not take it.' I said, 'Jim, how can you talk that way?' and he said, 'Well, that's my way.' My husband went to town with the milk wagon when this happened. When he came home I told him what Jim had been saying; and when they were all sitting at the supper table, about half past seven o'clock, my husband came in and said: 'Jim, I heard you have been cursing my wife; is it so?' He said: 'Yes, I did so.' Brown was sitting at the table when he said so, when my husband reached his hand behind to get his pistol, and shot him just as Brown got up from the table, and Brown throwed his hand to his shoulder and said, 'Oh!' and went into the next room. Brown

had been working about two months with Mr. Coulson. He lived about three hours after the occurrence. After the first shot, my husband followed Brown and fired a second shot, but I pushed up his arm and he fired into the air, and I took the pistol away from him.

"After that he left and went toward town. My husband owned the pistol now shown me, but told me that he had sold it to E. C. Lewis about a month ago, and this is the identical pistol that the shooting was done with."

Q. "You were sworn to testify upon the investigation in the coroner's court when you made that statement?"

A. "I was sworn to testify who did the shooting."

Q. "You were sworn to testify upon the coroner's inquest?"

A. "Yes, sir; I was. This was the next day after the shooting, but I don't remember whether morning or evening. I saw Captain Hughes and Mr. Alexander on Coulson's premises on May 8, and made a statement to them."

Q. "Did you tell them that deceased went to your room and made to you the indecent proposition to go to bed with him?"

A. "I did not. They asked me about the shooting, and how it was done. They did not ask me why it was done, and I did not tell them."

Q. "Did you not state to them as follows: 'Jim Brown came over to my room and began to swear' ?"

A. "Yes, sir, I told about the swearing."

Q. "Did you not tell them that you said to Brown: 'Jimmy, please don't swear that way' ?"

A. "Yes, sir; I told them that."

Q. "Didn't you tell them he said: 'I don't give a God d—n' ?"

A. "I think I did."

Q. "Didn't you also say that he said: 'If you don't like it you need not take it' ?"

A. "I don't remember whether I told them that or not. That is my statement before the coroner's inquest."

Q. "Did you not tell them that you said: 'How can you talk in that way?' and he said: 'Well, it's my way'—didn't you tell them that?"

A. "I don't remember if I told them that or not. I told them that my husband went to town with the milk wagon when this thing happened. I told them that when he came home I told him what Jimmy had been saying. I told them that they were all sitting at the table when he came in and said: 'Jimmy, I

heard you have been cursing my wife,' and that Brown was sitting at the supper table when he said so."

Q. "And did you tell him that your husband reached his hand behind him to get the pistol, and shot just as he got up from the table?"

A. "No, sir; I did not so tell Mr. Hughes. I told him that he was standing at the side of my room, and showed him the very place. I did not tell him just when Brown got up. I suppose I testified so before the coroner."

Q. "Did you not say that Brown threw his hand to his shoulder, said 'I am shot,' and went into the next room?"

A. "That was my statement to the coroner, not to Mr. Hughes."

Q. "Did you not tell him that after the first shot your husband followed Brown and fired a second shot, and that you pushed up his arm and he fired into the air?"

A. "Yes, I told him all of that."

Q. "Did you tell him that you took the pistol away from your husband, and that he afterwards went off towards town?"

A. "I don't remember whether I did or not."

Q. "You did not tell him, as you have testified here, that Brown came to your room at half past three in the morning, and wanted to get in bed with you?"

A. "No, sir."

Q. "Nor did you state it on the coroner's inquest?"

A. "No, sir; I did not. It is a fact that the first time I made that statement about his coming to my room was some time afterwards, on the habeas corpus trial. I don't remember how long that was after the homicide."

Q. "Do you know Mrs. Coulson? Did you or not, between the homicide and the habeas corpus trial, have a conversation with Mrs. Coulson about this case? If so, was or was not your testimony, to be thereafter given on the habeas corpus trial, reduced to writing?"

A. "Mrs. Coulson noted down for me a few facts she thought I might need to refresh my memory. She took them down for my use and benefit, and as I gave them to her, but I did not see them."

Q. "Did you then give to Mrs. Coulson a correct statement of the whole transaction?"

A. "No, sir; I did not."

Q. "Did not Mrs. Coulson take the notes down for you at

your request, and did you not tell her that you had never been in court, and that you wanted to state the affair exactly as it occurred?"

A. "No, sir; I did not make any such request of Mrs. Coulson. She offered herself. Mrs. Coulson came to me and asked if I did not think it would be a good idea to take down a few notes from which to refresh my memory, and I told her I thought it would. I first thought at that time that I would tell her the whole thing, but reflecting that she might tell Mr. Coulson, I decided not to do so. Mrs. Coulson took down those notes before I went before the grand jury. I destroyed them."

Q. "Did you, when Mrs. Coulson was making those notes, claim to her that deceased went to your room and made indecent proposals to you?"

A. "No, sir; I did not."

Q. "Did you ever claim it to any one before you went upon the stand in the habeas corpus trial?"

A. "I told my sister-in-law, Mrs. Cox, a few days before the habeas corpus trial. She was the first person, except my husband, to whom I told it. I didn't remember telling Mr. Coulson any thing at all. I don't know how many conversations I had with Mr. Coulson about this matter, but not several. I talked to Mrs. Coulson more than twice about it, but never told her anything about the indecent proposition. I had decided not to tell that part of the transaction until I could tell it from the stand on the trial. I was advised to do so by Mr. Hand. I saw Mr. Hand on the morning after the homicide. Pretorius, "Johnny" and Mitchell occupied the room. I had not been to bed at all on the night of the sixth. I suppose Pretorius was in the room next to where Brown was talking. I don't know whether Howell was in the next room or not. Dyall was not. I think John Fuchs was in there. Allen Sharpley slept in a room about one hundred and fifty yards from the house. Neither Gilbert, Swaggerty nor Nolan were there."

Q. "To whom, then, was Brown talking when he said that he would not work for any son of a bitch who would make him get up at three o'clock in the morning?"

A. "He was talking to Pretorius and Johnny, and, I suppose, was talking of Mr. Coulson. A plank partition divided my room from theirs. Pretorius and Johnny slept there, but Brown did not. When deceased came into my room, I presume that Pretorius and Fuchs were at the dairy. I don't think they

were in the room, though they may have been. I never claimed in any conversation I ever had with Coulson, Hughes or Alexander that Brown ever came into my room. Nor did I so state on the coroner's inquest. Pretorius, Howell, Dyall, Fuchs, Sharpley, Swaggerty, Mitchell and Brown had breakfast at my house that morning at about seven o'clock. Nolan did not eat breakfast then. We had dinner at two or half past two o'clock. I did not see Brown between dinner and supper, and suppose he was at his work. He worked at Coulson's house. Brown was on the place when my husband got home at noon, but I did not see him when my husband left after dinner, which was about half-past two. I suppose that Brown was then at Coulson's house. My husband kept his team at the dairy stable, about thirty yards from Coulson's house. Brown's work was about that stable. Defendant had his dinner before the men did. They came to dinner soon after defendant left. Dinner was two hours or more late on that day. The men were not through milking when defendant ate his dinner, and did not come to theirs until they finished milking. Up to that day Hand had charge of the dairy, but on that day Mr. Coulson took charge. Brown had got up from the supper table when he was shot. I don't remember how long Pretorius worked at the dairy after the homicide, but not long. 'John Fuchs stayed but a few days; Sharpley but a few days. Swaggerty was driver of the water wagon, and was not in Coulson's employ. He quit boarding at witness's house on the eighth. Mitchell stayed there two or three weeks, but left before the habeas corpus trial. I don't know what has become of any of these men. I don't know that any of them were or were not at the habeas corpus trial."

On her re-examination, the witness said that she said nothing about Brown going to her room because she was ashamed of it, and thought it enough for her husband to know it. She went in person to Coulson, after the shooting, to get money. Mrs. Coulson was then in Austin. She knocked at Coulson's door, and told him she was in trouble and wanted money. Coulson replied that he had none, but would look around for some. He then gave witness sixty-five cents and said: "God knows if I had more I would give it to him. Tell Louis to fly the country." On the next day Mr. Hand told witness not to tell a part of this transaction, and witness was too mortified and ashamed to want to do so. Mrs. Coulson suggested the making of the notes testified about on the cross examination. Witness did not know what

had become of those notes.   Some sort of business change made
dinner late on May 7.   The witness protested that she told the
truth in her statements to Coulson, Hughes and Alexander, as
far as she went, but kept back everything she didn't want them
to know.

Re-crossed, the witness said that she was placed on the stand at
the coroner's inquest, but nobody asked her any questions, except
to tell how the killing took place.   She told about the cursing as
it appears in her written testimony.   They did not ask the wit-
ness the cause of the shooting.

On re-examination, the witness was asked if, in answer to ques-
tions or by voluntary statement, she stated to the coroner that
"Jimmy Brown came over next to my room and began to swear."
Witness answered: "They asked me to tell how the killing took
place, and who did it.   I don't think they said anything about
'everything about it.'   I was nervous and excited, and there
were parts I did not want to tell.   I don't remember what
the coroner said in administering the oath.   I presume I was
sworn.   I don't remember whether he told me to tell all about it
or not.   He asked me to tell about the shooting."

Q.   "Did he tell you to tell all about it?"

A.   "As far as I can remember so.   I know I had to tell
something.   I know exactly what is in that paper.   I told the
coroner exactly as it is in there."

Q.   "After you had taken the oath to tell all about it, did you
purposely suppress what you have testified here to-day?"

A.   "Yes, sir; I did."

Raymond J. Hand was the next witness for the defense.   He
testified that on the fatal day he was residing on West Houston
street, in San Antonio.   He was not then in any real way inter-
ested in matters at Coulson's dairy, though he had been, until a
few days before, one of the renters of Coulson's dairy.   He knew
Coulson, Mrs. Williams and defendant.   He saw Mrs. Coulson
on the day after the homicide.   The witness was here asked if
Mrs. Williams on the day after the homicide made any state-
ment to him about it.   The question was objected to by the State,
and the objection was sustained by the court.

The defense closed.

Allen Sharpley was the first witness called by the State in
rebuttal.   He testified, in substance, that he was at defendant's
house on the night of May 7, 1886, and saw the firing of the first
shot by defendant.   Witness was sitting at the supper table when

that shot was fired. A short time before that, the deceased was sitting at the same table, directly opposite the witness. The defendant, at the time the shot was fired, was standing in the kitchen door. Referring to the immediate shooting, the witness said: "As he was passing through the door from the dining-room into the main part of the house at which Mr. Williams lived, the pistol was fired just as he was passing from the dining-room into the house. When he was shooting Brown, he went out through the door he started through. To the best of my knowledge, Williams went out at the door he came in. I don't know positively, because as the pistol went off I went out at the window, and the next I saw of Williams was on the other side of the house. He could have met me there coming out of the other door, but I was of impression that he went out the door he came in. I was close to the window I went out of. I kind of rolled up and rolled out—getting out the quickest and best way that I could. As the room was small, I did not know in which direction the bullets might go—and I was kind of scared, and didn't want any chances. But few minutes elapsed after the shots before I met Williams again. I asked him not to shoot me. He asked: 'Where is the d—d son of a bitch?' I told him I didn't know; and that was all that was said. But few moments after I rolled out of the window a second shot was fired. When I first saw Williams, after I got out of the house, he was alone. Mrs. Williams was not with him."

Cross examined, the witness said that he did not see Coulson at or about the time of the shooting. He could say nothing about Mrs. Williams getting or trying to get hold of defendant's arm when the second shot was fired, as at that time the corner of the house was between him and Williams. He saw Mrs. Williams a very short time after the second shot was fired. Witness had a conversation with Brown about his imputed conduct to Mrs. Williams. Witness had heard that Brown had cursed in Mrs. Williams's presence, and asked Brown about it. He did not deny it. Witness advised him to apologize to Mrs. Williams. Brown merely replied that, when a lady got out of her place with him, he would get out of his place too. He said, also, that if defendant said anything to him about it, he would merely ask him in a polite manner not to do it again. Witness told Mrs. Williams that he had tried to get Brown to apologize to her, but did not tell her that Brown said that if defendant did not like it, he could shoot it out. Witness heard nothing about Brown ask-

ing Mrs. Williams to go to bed with him, and of course said nothing to Brown about that. His conversation with Brown referred alone to Brown's cursing in the presence of Mrs. Williams.

Mrs. S. E. Coulson was next introduced by the State in rebuttal. She testified, in substance, that she was in the city of Austin when the tragedy occurred. She returned to San Antonio on the first train after it happened, and Mrs. Williams came to see her as soon as she got home. She undertook to narrate to witness the facts attending the shooting, but was so distressed that she talked incoherently, and witness advised her to postpone her disclosure to another time. She came back next day and made what purported to be a detailed statement of the tragedy. Witness asked her if she had related all the incidents upon the inquest as she had to her. Mrs. Williams replied she had not, as she was too much excited and disturbed to think of them. The witness then told Mrs. Williams that her duty to her husband demanded that she should tell everything that would be of advantage to him, and proposed to note down for her, under appropriate heads, all facts pertinent to the case to which she could testify. These notes she designed for the use of Mrs. Williams when she should go on the stand on the habeas corpus trial. The proposal to make the notes was made by witness. Mrs. Williams not only did not claim to witness that Brown insulted her by making improper advances toward her, but, in reply to witness's direct question whether or not he attempted indecent overtures, she denied it positively. Witness had known Mrs. Williams ever since she came to Texas, and regarded her as one of the purest women she had ever known. She was friendly to Mrs. Williams at the time of and before the homicide, was friendly to her now, and hoped and expected to regard her as a worthy friend always.

David Coulson, recalled by the State, in rebuttal, testified that, soon after the shooting, Mrs. Williams either came to, or sent to him for money. Witness thought she came herself. He gave her sixty-five cents, which was all the money he had except his funds in the bank. He did not tell her that he would give her or defendant more if he had it, nor did he tell her to tell defendant to fly the country.

The defendant's first bill of exceptions recites the excluded evidence which is the subject matter of the second head note of this report. That bill shows the defense proposed to corroborate

the testimony of Mrs. Williams by proving by the witness Hand that, on the morning after the homicide, Mrs. Williams, after telling him about the cursing of deceased, said to him, witness Hand, that there was much more she would like to tell him, but was ashamed to mention it to a man, whereupon the witness Hand told her that, if deceased had insulted her by making indecent proposals to her, not to mention that fact to any one at that time; that a proper time to tell it might come, and she had better wait for that time.

*Teel & Haltom,* filed an able and exhaustive brief for the appellant.

*W. L. Davidson,* Assistant Attorney General, for the State.

WILLSON, JUDGE. In this case it is conclusively shown by the evidence, and is not controverted by the defendant, that the homicide charged was committed by the defendant, and that it was an unlawful homicide. But it is contended by the defendant that he is not guilty of a higher grade of homicide than manslaughter, and has been illegally and unjustly convicted of murder in the second degree.

To reduce the homicide to manslaughter, the defendant relies upon insulting language used by the deceased to defendant's wife, the defendant not being present at the time of such insult, but, having been informed thereof, killed the deceased thereafter, on first meeting with him.

Defendant's wife testified on the trial that deceased cursed her and made an indecent proposal to her, that is, proposed that she should get in bed with him; that her husband, the defendant, was absent at the time; that, when her husband returned home on the same day of the insult, she informed him of the insult, and on the evening of that day the homicide occurred. The insults and the homicide were in defendant's house, where deceased at the time was boarding. Upon cross examination by the State of the defendant's wife, she admitted that in statements made by her about the cause of the homicide, to Hughes, Mrs. Coulson and to the coroner's jury, she had not mentioned the fact to which she testified on the trial, that the deceased not only cursed her, but that he made an indecent proposal to her. She stated that she had not told any one about said indecent proposal except her husband and her sister-in-law, but had intimated it to Mr.

Hand in narrating the facts to him, and that he advised her not to tell it to any one until the proper time arrived, and that she did not tell it until she testified as a witness on the habeas corpus trial of the case.

Having elicited from the witness these admissions, the State, over the objection of the defendant, was permitted to prove by Mrs. Coulson that the witness had detailed to her the circumstances of the homicide, and had not mentioned the said indecent proposal of the deceased, but, when asked if any such proposal had been made, "denied everything of the sort."

It is insisted by counsel for the defendant that this portion of the testimony of Mrs. Coulson was improperly admitted. In our opinion, the testimony was not admissible. "A witness called by the opposing party can be discredited by proving that on a former occasion he made a statement inconsistent with his statement on trial, provided such statement be material to the issue. * * * And a witness may be discredited by proof that he now states facts which, on a former trial, he omitted to state. And generally, whenever, on a former occasion, it was the duty of the witness to state the whole truth, it is admissible to show that the witness, in his statement, omitted facts sworn to by him at the trial. But it is only upon a denial, direct or qualified, by the witness, that such statements were made, that proof of them can be made." (Whart. Cr. Ev., secs. 482, 483.)

Now, in this case, the witness sought to be impeached not having denied, but having expressly admitted, that she omitted to tell Mrs. Coulson about the insulting proposal testified to by her on the trial, the testimony of Mrs. Coulson in regard thereto was unnecessary, immaterial and improper, and might have produced an unfavorable impression upon the minds of the jury in weighing the testimony of Mrs. Williams. We think it was error, and can not say that it was not material error, to admit said portion of Mrs. Coulson's testimony.

In rebuttal of the impeaching testimony introduced by the State attacking the credibility of the statements testified to by Mrs. Williams as to the indecent proposal made to her by the deceased, the defendant proposed to prove by Mr. Hand that, soon after the homicide, Mrs. Williams had stated to him that the deceased had cursed her, and that deceased had said and done a great deal more than she would like to tell him, witness, but that she was ashamed to mention it to a man, and that he told her that, if the deceased had insulted her by indecent pro-

posals, not to mention it to any one—that a time might come for her to tell it, but to wait for that time. This proposed testimony was objected to by the State upon the ground that it was not competent for the defendant to prove that the witness had made statements corroborating her testimony on the trial. The objection was sustained and the defendant excepted.

We are of the opinion that the testimony was competent. It has been held by this court, upon the weight of authority, that an impeached witness may be corroborated by proof that he had made the same statements at other times as those testified to by him on the trial, and about which he was impeached. (Bailey v. The State, 9 Texas Ct. App., 98.) The proposed testimony of Hand would show that Mrs. Williams, on the next morning after the homicide, intimated to him that the deceased had not only cursed her, but had made indecent proposals to her, and to this extent corroborated her testimony on the trial. Hand's testimony also tended to explain why it was that Mrs. Williams had not told Mrs. Coulson and others about said indecent proposals. Mrs. Williams was the defendant's most material witness. Upon her testimony, and the credit which might be given it by the jury, depended the grade of his offense. It was of vital importance to him that her testimony should go before the jury free from suspicion, and it was his right, if he could do so, to remove by rebutting evidence any doubt or discredit which had been cast upon it by the impeaching evidence of the State. For this purpose we think the rejected testimony of the witness Hand was competent and material, and that the court committed material error in excluding it from the jury.

On the trial an exception was taken to the charge of the court on manslaughter, which exception, we think, must be sustained. The charge complained of instructs the jury that, to reduce the homicide to manslaughter, among other things, the provocation upon which the defendant acted must have arisen at the time of the commission of the offense. Under the facts of this case, this instruction was erroneous. In cases like this, it has been repeatedly held that the requirement of article 594 of the Penal Code, that the provocation must arise at the time of the killing, and that the passion be not the result of a former provocation, is inapplicable, and should not be given in charge to the jury; but that, instead thereof, the jury should be instructed that the time intervening between the slayer's apprisal of the insult and his first meeting with the deceased is not a ma-

terial consideration, provided the adequate cause be shown, and the state of the slayer's mind predicated thereon, did actually exist at the time of the killing. (Willson's Texas Crim. Laws, secs. 1009, 1022; and see particularly Eanes v. The State, 10 Texas Ct. App., 421, in which case the proper issues to be submitted to the jury in a case like this are clearly stated.)

Another exception made to the charge of the court is that it prescribes the forms of verdicts of guilty of murder in the first and second degrees, but omits to prescribe any form for a verdict of guilty of manslaughter, or for a verdict of not guilty. In this respect the charge is imperfect, but perhaps not materially so. It is not essential to the sufficiency of the charge that it should instruct the jury in the forms of verdicts which may be rendered by them, though it is very proper, we think, to do so. But when such instructions are given, they should embrace every verdict which might be rendered in the case, so as to avoid conveying to the minds of the jury any impression as to the opinion of the court as to which of several verdicts should be rendered.

Other exceptions to the charge are urged by counsel for defendant, but are not, in our opinion, well founded. In other respects than those we have mentioned, we think the charge is unobjectionable.

Because of the errors discussed the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

Opinion delivered February 1, 1888.